UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

--------------------------------------------------------------------------x

JOSHUA BROOKS, JOYCE BROOKS, DANNY : 
BROOKS, DANIEL TYLER BROOKS, LARK ADAMS, : 
DELILAH BROWN, SHEILA TRACY, SHEILA TRACY : 
FOR THE ESTATE OF JACOB TRACY, DONALD : 
TRACY, NICHOLE SWEENEY, CHRISTINA : 
SHERIDAN, MATTHEW BENSON, MELISSA BENSON, : 
C.B., a minor, B.B., a minor, DANIEL P. BENSON, : 
CAROL BENSON, DANIEL R. BENSON, DREW : 
EDWARDS, DONIELLE EDWARDS, SEAN : 
HARRINGTON, MARGARITA ARISTIZABAL, : 
MARGARITA ARISTIZABAL FOR THE ESTATE OF : 
ALFRED H. JAIRALA, J.J., a minor, SEBASTIAN : 
NIUMAN, TYLER GINAVAN, BELINDA GARCIA, : 
JENNIFER ROOSE, NATHAN RICHARDS, and ROADY :    Case No.:
LANDTISER, :
 :
        Plaintiffs, :
 :
-against- :    **COMPLAINT**
 :
BANK MARKAZI JOMHOURI ISLAMI IRAN :
Mirdamad Boulevard :
No. 198 :
Tehran, Iran :
 :
BANK MELLI IRAN :
Ferdowsi Avenue :
Tehran, Iran :
 :
MELLI BANK PLC :
98a Kensington High Street :
London W8 4SG :
United Kingdom :
 :
and :
 :
NATIONAL IRANIAN OIL COMPANY :
Hafez Crossing :
Taleghani Avenue :
Tehran, Iran :
 :
        Defendants. :

--------------------------------------------------------------------------x

Plaintiffs, by and through their attorneys, allege the following:

## I.    NATURE OF THE ACTION

1.    This is a civil action pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A ("FSIA"), for wrongful death, personal injury and related torts, by the estates and families of United States nationals and/or members of the U.S. armed forces who were killed or injured in Iraq by agents of the Islamic Republic of Iran ("Iran") between 2004 and 2011.

2.    Iran's aforementioned agents included the U.S.-designated Foreign Terrorist Organization (as that term is defined in 8 U.S.C. § 1189) Hezbollah; the Islamic Revolutionary Guard Corps ("IRGC"), whose subdivision known as the Islamic Revolutionary Guard Corps-Qods Force ("IRGC-QF") is a U.S.-designated Specially Designated Global Terrorist ("SDGT"); and other terrorist agents that included a litany of Iraqi Shi'a terror groups referred to herein collectively as "Special Groups."

3.    Both before and during the U.S. occupation of Iraq and its subsequent peacekeeping mission, Iran supported a terror campaign against U.S. troops, civilian personnel and Iraqi civilians.

4.    During the period of 2004 through 2011 (the "relevant period"), Iran was under stringent international sanctions that limited its access to the U.S. financial system and U.S. export-controlled technologies, spare parts and raw materials.

5.    In order to fund its terror campaign in Iraq and other nefarious activities, Iran directed its state owned and/or operated banks, including Defendants Bank Markazi Jomhouri Islami Iran ("Bank Markazi," "Central Bank of Iran" or "CBI"), Bank Melli Iran, Melli Bank PLC, and the state owned and operated National Iranian Oil Company ("NIOC") to conspire with an assortment of Western financial institutions willing to substantially assist Iran in evading U.S. and

international economic sanctions, conducting illicit trade-finance transactions and disguising financial payments to and from U.S. dollar-denominated accounts.

6.      As detailed below, the Defendants herein directed millions of U.S. dollars in arms, equipment and materiel to Hezbollah, the IRGC and the IRGC-QF, which, in turn, trained, armed, supplied and funded Iran's terrorist agents in Iraq in carrying out their attacks against Plaintiffs and their family members.

## II.      JURISDICTION AND VENUE

7.      This Court has jurisdiction over this matter and over the Defendants pursuant to 28 U.S.C. §§ 1330(a), 1330(b), 1331, 1332(a)(2), and the FSIA, 28 U.S.C. § 1605A(a)(2), which create subject-matter and personal jurisdiction for civil actions for wrongful death and personal injury against "foreign states" that have been designated as State Sponsors of Terrorism and their officials, employees and agents.[1]

8.      The United States officially designated Iran a State Sponsor of Terrorism on January 19, 1984, pursuant to § 6(j) of the Export Administration Act, § 40 of the Arms Export Control Act, and § 620A of the Foreign Assistance Act.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(f).

---

[1]      28 U.S.C. § 1603(b) defines "foreign state" to include "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." The statute defines an "agency or instrumentality" as any entity (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of the foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by the foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e), nor created under the laws of any third country.

### III.   FACTUAL ALLEGATIONS

### A.   DEFENDANTS

### 1.   BANK MARKAZI JOMHOURI ISLAMI IRAN

10.     Bank Markazi Jomhouri Islami Iran is the central bank of Iran.  The Central Bank of Iran was established in 1960, and, according to its website, CBI is responsible for the design and implementation of Iran's monetary and credit policies.[2]

11.     CBI is headquartered at Mirdamad Boulevard, No. 198, Tehran, Iran.

12.     CBI has provided millions of dollars to terrorist organizations via other Iranian-owned and controlled banks.  For example, in a press release issued by the U.S. Treasury Department in 2007 regarding the designation of the Iranian-owned Bank Saderat as an SDGT, the U.S. Government noted that:

> Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hezbollah and EU-designated terrorist groups Hamas, PFLP-GC, and Palestinian Islamic Jihad. For example, from 2001 to 2006, Bank Saderat *transferred $50 million from the **Central Bank of Iran** through its subsidiary in London to its branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence*. (Emphasis added.)

13.     According to the United States' Financial Crimes Enforcement Network ("FinCEN"):

> The Central Bank of Iran, which regulates Iranian banks, has assisted designated Iranian banks by transferring billions of dollars to these banks in 2011. In mid-2011, the CBI transferred several billion dollars to designated banks, including Saderat, Mellat, EDBI and Melli, through a variety of payment schemes. In making these transfers, the CBI attempted to evade sanctions by minimizing the direct involvement of large international banks with both CBI and designated Iranian banks.

---

[2]      http://www.cbi.ir/page/GeneralInformation.aspx.

14.     CBI is an alter-ego and instrumentality of the Iranian government and its Supreme

Leader, and it has routinely used Iranian banks like the other Defendant Iranian banks as conduits

for terror financing and weapons proliferation on behalf of the Iranian regime.

### 2.     BANK MELLI AND MELLI BANK PLC

15.     Bank Melli Iran, one of the largest banks in Iran, was established in 1927 by order

of the Iranian Parliament.

16.     Following the Iranian Revolution in 1979, all banks in Iran were nationalized, and,

as discussed below, even now most are effectively controlled by the Iranian regime.

17.     Bank Melli Iran is headquartered at Ferdowsi Avenue, Tehran, Iran.

18.     Bank Melli Iran maintains a branch office in Germany, located at Holzbrücke 2,

20459 Hamburg, Germany.

19.     Bank Melli Iran is an "agency or instrumentality" of the government of Iran as

defined by 28 U.S.C. § 1603(b).

20.     As discussed in detail below, Bank Melli Iran is dominated and controlled by Iran

to such an extent that it rightfully can be considered an organ of the state as defined by 28 U.S.C.

§ 1603(b)(2).

21.     Melli Bank Plc in London was established in January 2002 as a wholly-owned

subsidiary of Bank Melli.

22.     Melli Bank Plc is headquartered at 98a Kensington High Street, London, W8 4SG,

United Kingdom.

23.     The Chairman of Bank Melli Iran serves as the Chairman of the Board of Directors

of Melli Bank Plc.

24.     Bank Melli Iran appoints all members of the Board of Directors of Melli Bank Plc.

25.     Melli Bank Plc is dominated and controlled by Iran to such an extent that it rightfully can be considered an organ of the state as defined by 28 U.S.C. § 1603(b)(2).

26.     According to the U.S. government, between 2004 and 2011, Bank Melli Iran and Melli Bank Plc in London transferred approximately $100 million USD to the IRGC-QF, which trained, armed and funded terrorist groups that targeted, killed and maimed American and Iraqi forces and civilians.

27.     In October 2007 and throughout the remainder of the relevant period, Bank Melli Iran and Melli Bank Plc were each designated as a Specially Designated National ("SDN") pursuant to Executive Order ("E.O.") 13382, and included on the Office of Foreign Assets Control's SDN list.[3] The U.S. Treasury Department press release announcing the designations stated:

> Bank Melli also provides banking services to the [Iranian Revolutionary Guard Corps] and the Qods Force. Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from financial transactions.

28.     A State Department diplomatic cable from March 2008 noted that:

> Bank Melli and the Central Bank of Iran also provide crucial banking services to the Qods Force, the IRGC's terrorist supporting arm that was headed by UNSCR 1747 designee Commander Ghassem Soleimani. Soleimani's Qods Force leads Iranian support for the Taliban, Hezbollah, Hamas and the Palestinian Islamic Jihad. Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services.

---

[3]     "The Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury administers and enforces economic and trade sanctions based on US foreign policy and national security goals against targeted foreign countries and regimes, terrorists, international narcotics traffickers, those engaged in activities related to the proliferation of weapons of mass destruction, and other threats to the national security, foreign policy or economy of the United States." https://www.treasury.gov/about/organizational-structure/offices/Pages/Office-of-Foreign-Assets-Control.aspx

29.     In addition, during the relevant time period, Bank Melli Iran financed evasions of U.S. sanctions on behalf of the Iranian-owned airline and SDGT, Mahan Airlines ("Mahan Air") and Iran's Ministry of Defense and Armed Forces Logistics.

30.     For example, Bank Melli issued a Letter of Credit to Mahan Air in August 2004 to help Mahan Air illegally acquire aircraft engines subject to the U.S. embargo.

31.     Bank Melli's financial support and assistance to Mahan Air is particularly significant because on October 12, 2011, the United States designated Mahan Air as an SDGT for "providing financial, material and technological support to the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF). Based in Tehran, Mahan Airlines provides transportation, funds transfers and personnel travel services to the IRGC-QF."

32.     The Treasury Department explained Mahan Air's direct involvement with terrorist operations, personnel movements and logistics on the IRGC-QF's behalf:

> Mahan Air [has] facilitated the covert travel of suspected IRGC-QF officers into and out of Iraq by bypassing normal security procedures and not including information on flight manifests to eliminate records of the IRGC-QF travel.
>
> Mahan Air crews have facilitated IRGC-QF arms shipments. Funds were also transferred via Mahan Air for the procurement of controlled goods by the IRGC-QF.
>
> In addition to the reasons for which Mahan Air is being designated today, Mahan Air also provides transportation services to Hezbollah, a Lebanon-based designated Foreign Terrorist Organization. Mahan Air has transported personnel, weapons and goods on behalf of Hezbollah and omitted from Mahan Air cargo manifests secret weapons shipments bound for Hezbollah.

33.     Mahan Air was also later identified as the conduit to Iran of *thousands* of radio frequency modules recovered by Coalition Forces in Iraq from Improvised Explosive Devices

("IEDs") and Explosively Formed Penetrators ("EFPs") that were used to target U.S. and Coalition Forces.

34.     In mid-2007, Bank Melli Iran's branch in Hamburg transferred funds on behalf of Iran's Defense Industries Organization ("DIO").

35.     DIO is an Iranian government-owned defense manufacturer whose name, logo and/or product tracking information was stamped on munitions found in weapons caches that were seized from the Special Groups in Iraq, including large quantities of weapons produced by DIO in 2006 and 2007 (*i.e.*, 107 millimeter artillery rockets, as well as rounds and fuses for 60 millimeter and 81 millimeter mortars).

### 3.     NATIONAL IRANIAN OIL COMPANY

36.     The National Iranian Oil Company, owned and overseen by the Government of Iran through its Ministry of Petroleum, is responsible for the exploration, production, refining and export of oil and petroleum products in Iran.

37.     NIOC is headquartered at Hafez Crossing, Taleghani Avenue, Tehran, Iran.

38.     NIOC is an "agency or instrumentality" of the Government of Iran as defined by 28 U.S.C. § 1603(b).

39.     In 2008, the Treasury Department identified NIOC (and other Iranian agencies) as "centrally involved in the sale of Iranian oil, as entities that are owned or controlled by the [Government of Iran]."

40.     Pursuant to E.O. 13382, the U.S. Government designated NIOC as an SDN.

41.     The U.S. Government has identified NIOC as an agent or affiliate of the IRGC.

42.     In September 2012, the U.S. Treasury Department handed its report to Congress regarding its determination that NIOC is an agent or affiliate of the IRGC. The report provided that:

Recently, the IRGC has been coordinating a campaign to sell Iranian oil in an effort to evade international sanctions, specifically those imposed by the European Union that prohibit the import, shipping, and purchase of Iranian oil, which went into full effect on July 1, 2012.

Under the current Iranian regime, the IRGC's influence has grown within National Iranian Oil Co. For example, on August 3, 2011, Iran's parliament approved the appointment of Rostam Qasemi, a Brigadier General in the IRGC, as Minister of Petroleum. Prior to his appointment, Qasemi was the commander of Khatam Al-Anbia, a construction and development wing of the IRGC that generates income and funds operations for the IRGC. Even in his new role as Minister of Petroleum, Qasemi has publicly stated his allegiance to the IRGC.

43.     As the IRGC has become increasingly influential in Iran's energy sector, Khatam Al-Anbia has obtained billions of dollars' worth of contracts with Iranian energy companies, including NIOC, often without participating in a competitive bidding process.

44.     Under the Iran Threat Reduction and Syria Human Rights Act of 2012 (ITRSHRA), the U.S. government determined that NIOC is an agent or affiliate of the IRGC under section 104(c)(2)(E)(i) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (CISADA) and section 302 of ITRSHRA.  As part of that 2012 certification, NIOC was formally determined to be part of the Government of Iran.

45.     In addition, the ITRSHRA provided that:

It is the sense of Congress that the National Iranian Oil Company and the National Iranian Tanker Company are not only owned and controlled by the Government of Iran but that those companies provide significant support to Iran's Revolutionary Guard Corps and its affiliates.[4]

46.     After the events giving rise to the claims herein, the U.S. government withdrew this determination as of 2016.[5]

---

[4]     *See* https://www.treasury.gov/resource-center/sanctions/Documents/hr_1905_pl_112_158.pdf.

[5]     On January 16, 2016, as part of "Implementation Day" for the U.S. government's understanding with Iran relating to its nuclear weapons program, the U.S. Treasury Department "determined that NIOC is no longer an agent or affiliate of the IRGC."

47.     NIOC used its oil and natural gas revenues to launder money for the IRGC, often using Defendant CBI for this purpose.

48.     In 2009, the Combatting Terrorism Center at West Point published a report on the role of NIOC, particularly in the Maysan province in Iraq (situated along the southeast border between Iran and Iraq), and its role in studying U.S. troop movements:

> The establishment of a new U.S. and Iraqi [Forward Operating Base] on the Iranian border has resulted in three waves of attacks in an area that was formerly devoid of incidents …. The incident occurred in the same district as the February 2007 EFP attack on a British aircraft at a Buzurgan dirt airstrip, itself a reaction by Special Groups to UK long-range patrolling of the Iranian border. This part of the border is increasingly the scene of U.S. and Iranian countermoves to support their proxies and patrol the frontier; Iranian intelligence gathering takes place using National Iranian Oil Company helicopters and border guards, while U.S.-Iraqi helicopter-borne joint patrols provide moral and material support to isolated Iraqi border posts and local communities.

49.     Thus, NIOC served a critical function in funding and supporting the IRGC's activities.

50.     NIOC also obtained letters of credit from western banks to provide financing and credit to the IRGC.[6]

**B.     IRAN'S LONG HISTORY OF SUPPORTING AND FINANCING TERRORISM**

51.     Since the Iranian Revolution in 1979, Iran has been a principal source of extremism and terrorism throughout the Middle East and the rest of the world, responsible for bombings, kidnappings and assassinations across the globe.

---

[6]     The Superseding Indictment filed in *U.S. v. Zarrab* (filed in the S.D.N.Y (1:15-cr-00867)) demonstrates that, as late as 2013, NIOC continued to illegally launder U.S. dollars through U.S. financial institutions.

52.     As noted above, the United States designated Iran a State Sponsor of Terrorism on January 19, 1984. That designation has remained in force throughout the relevant period to this action.

53.     Iran has had a long, deep, strategic partnership with the Lebanese-based Foreign Terrorist Organization ("FTO") Hezbollah, which historically has served as Iran's proxy and agent, enabling Iran to project extremist violence and terror throughout the Middle East and around the globe.

54.     For more than 30 years, Iran, through the IRGC, has funded, trained and equipped Hezbollah.

55.     The IRGC-QF's "Department 2000" manages Iran's relationship with Hezbollah, which includes the flow of some of Iran's most sophisticated weapons systems, including military grade EFPs, anti-tank guided missiles, RKG-3 armor penetrating anti-tank grenades and various rockets, such as the Fajr-5.

56.     Since the 2003 U.S. overthrow of Saddam Hussein's regime in Iraq, Iran has assiduously worked to expand its influence in Iraq and throughout the region in a variety of ways, including by fomenting violence and terrorism when such activities have served its ambitions.

C.      **IRAN ORCHESTRATED A TERROR CAMPAIGN IN IRAQ**

57.     Sometime after the 2003 U.S. invasion of Iraq, Hezbollah created "Unit 3800," an entity dedicated to supporting Iraqi Shi'a terrorist groups targeting Multi National Forces in Iraq ("MNF-I").

58.     Unit 3800 was established by Hezbollah leader Hassan Nasrallah at Iran's request.

59.     Unit 3800 has trained and advised various Shi'a militias in Iraq, later termed the Special Groups.

60.    Hezbollah training camps in southern Lebanon and Iran, and Hezbollah's expertise in the use of EFPs, kidnapping, communications and small-unit operations, were critical to the IRGC's operations in Iraq between 2004 and 2011.

61.    Iran's support of terrorist groups in Iraq was described in the U.S. State Department's 2005 *Country Reports on Terrorism*, which observed:

> Iran has provided political and ideological support for several terrorist and militant groups active in Iraq. Attractive to terrorists in part because of the limited presence of the United States and other Western governments there, Iran is also a safe haven in that known terrorists, extremists, and sympathizers are able to transit its territory and cross the long and porous border into Iraq. Iran also equips terrorists with technology and provides training in extremist ideology and militant techniques.

62.    According to the same report: "[t]he IRGC was increasingly involved in supplying lethal assistance to Iraqi militant groups, which destabilizes Iraq …. Senior Iraqi officials have publicly expressed concern over Iranian interference in Iraq, and there were reports that Iran provided funding, safe passage, and arms to insurgent elements."

63.    By early 2005, the presence of Hezbollah operatives in Iraq became an open secret when Iraqi Interior Minister Falah al-Naquib announced the arrest of eighteen Lebanese Hezbollah members on terrorism charges.

64.    Two years later, according to U.S. intelligence estimates—and following the 2007 arrest and interrogation of Hezbollah's senior operative in Iraq—the IRGC-QF provided Hezbollah and one of its local trainers, Ali Musa Daqduq (discussed in greater detail below), up to $3 million in U.S. currency every *month*.

65.    In 2008, Pentagon Press Secretary Geoff Morrell reported on the "smuggling system -- in which the Iranians are providing their allies within Iraq, these special groups, with the

munitions that are then used to take on us, whether it be EFPs or rockets or conventional arms. These are being used by these special groups and being provided by the Iranians."

66.     According to a 2010 report by the Combatting Terrorism Center at West Point, Iran paid Iraqi "insurgent" groups "between $4,000 and $13,000 per rocket or roadside bomb, depending on the circumstances."

67.     According to Brigadier Gen. Kevin J. Bergner, a U.S. military spokesman who previously served as the Deputy Commanding General for MNF-I in Mosul, Iraq, "the Qods Force has provided armor-piercing weapons to extremist groups in Iraq, funneling them up to $3 million a month and training Iraqi militiamen at three camps near Tehran."

### D.   IRANIAN AGENTS DESIGNED AND PRODUCED EFPs USED TO KILL OR MAIM COALITION FORCES, INCLUDING THE PLAINTIFFS

68.     Improvised Explosive Device is a term commonly used by the U.S. military as shorthand for a roadside bomb.

69.     However, in Iraq, the IRGC and Hezbollah supplied and trained various Special Groups to deploy EFPs.

70.     EFPs are a particularly effective form of manufactured IED sometimes referred to as a shaped charge, usually made with a manufactured concave copper disk (called the "liner") and a high explosive packed behind the liner.

71.     In Iraq, EFPs were often triggered by various technologies, including passive infra-red sensors (tripped by the engine heat of passing vehicles) and radio frequency modules (triggering the weapon when high-powered radio waves were generated by Coalition Forces' jamming devices).

72.     Once triggered, an explosion took place within the steel casing of the EFP, forcing the copper liner forward, and turning it into a high-velocity molten slug, traveling at over a mile

per second, that could pierce the military-grade armor of most U.S. vehicles deployed in Iraq at distances as far as 300 feet from the EFP's emplacement.

73.     Metallurgic analysis by U.S. technicians helped confirm that the high-purity copper EFP liners were not generally produced in Iraq.

74.     Differences in the liners indicated the kind of press that was required to fabricate them—a heavy (hydraulic) press not commonly seen in Iraq.

75.     To produce these weapons, copper sheets were often loaded onto a punch press to yield copper discs. These discs were annealed in a furnace to soften the copper. The discs were then loaded into a large hydraulic press and formed into the disk-like final shape. This manufacturing process is critical to the design and concomitant lethality of the weapon.

76.     EFPs are far more sophisticated than homemade explosive devices such as traditional IEDs, and they are specifically designed to target vehicles such as armored patrols and supply convoys, though Hezbollah and the Special Groups have deployed them against U.S. and Iraqi civilians as well.

77.     Iran propagated its specialized weapons knowledge up and down its network of terror proxies in Iraq, as the U.S. State Department documented in its 2006 *Country Reports on Terrorism* regarding Iran's specific efforts to provide terrorists with lethal EFPs to ambush and murder U.S. and other Coalition Forces:

> Iran provided guidance and training to select Iraqi Shia political groups, and weapons and training to Shia militant groups to enable anti-Coalition attacks.  Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hezbollah.  The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces.  The Revolutionary Guard, along with Lebanese Hezbollah, implemented training programs for Iraqi militants in the construction and use of sophisticated IED technology.

>      *These individuals then passed on this training to additional militants in*
>      *Iraq.* (Emphasis added.)

78.     Also in 2006, Brigadier Gen. Michael Barbero, Deputy Chief of Staff for Strategic

Operations of the MNF-I stated: "Iran is definitely a destabilizing force in Iraq. I think it's

irrefutable that Iran is responsible for training, funding and equipping some of these Shi'a

extremist groups and also providing advanced IED technology to them, and there's clear evidence

of that."

79.     According to the U.S. State Department's 2008 *Country Reports on Terrorism*:

>      The Qods Force, an elite branch of the Islamic Revolutionary Guard Corps
>      (IRGC), is the regime's primary mechanism for cultivating and supporting
>      terrorists abroad. The Qods Force provided aid in the form of weapons,
>      training, and funding to HAMAS and other Palestinian terrorist groups,
>      Lebanese Hezbollah, Iraq-based militants, and Taliban fighters in
>      Afghanistan.…
>
>      Despite its pledge to support the stabilization of Iraq, Iranian authorities
>      continued to provide lethal support, including weapons, training, funding,
>      and guidance, to Iraqi militant groups that targeted Coalition and Iraqi
>      forces and killed innocent Iraqi civilians. Iran's Qods Force continued to
>      provide Iraqi militants with Iranian-produced advanced rockets, sniper
>      rifles, automatic weapons, and mortars that have killed Iraqi and Coalition
>      Forces as well as civilians. Tehran was responsible for some of the lethality
>      of anti-Coalition attacks by providing militants with the capability to
>      assemble improvised explosive devices (IEDs) with explosively formed
>      projectiles (EFPs) that were specially designed to defeat armored vehicles.
>      The Qods Force, in concert with Lebanese Hezbollah, provided training
>      both inside and outside of Iraq for Iraqi militants in the construction and use
>      of sophisticated IED technology and other advanced weaponry.

80.     One of the ways in which the IRGC provided "militants with the capability to

assemble improvised explosive devices (IEDs) with explosively formed projectiles (EFPs) that

were specially designed to defeat armored vehicles" included providing them with manufacturing

supplies such as copper and steel, as well as machinery—including hydraulic presses used to form

copper into the shape of disks used in EFPs.

81.     Iran also introduced other weapons into Iraq for the purpose of supporting terrorist attacks on U.S. and coalition personnel.

82.     These included Improvised Rocket-Assisted Munitions ("IRAMs"), RPG-29s and RKG-3 armor penetrating anti-tank grenades deployed by Special Groups.

83.     Likewise, the State Department's 2011 *Country Reports on Terrorism* reported:

> Despite its pledge to support the stabilization of Iraq, Iran continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi Shia militant groups targeting U.S. and Iraqi forces, as well as civilians. Iran was responsible for the increase of lethal attacks on U.S. forces and provided militants with the capability to assemble explosives designed to defeat armored vehicles. The IRGC-QF [Islamic Revolutionary Guard Corps-Quds Force], in concert with Lebanese Hezbollah, provided training outside of Iraq as well as advisors inside Iraq for Shia militants in the construction and use of sophisticated improvised explosive device technology and other advanced weaponry.

**E.     IRAN SUPPORTED SPECIAL GROUPS IN IRAQ THAT COORDINATED WITH HEZBOLLAH AND THE IRGC**

**1.     THE BADR CORPS/BADR ORGANIZATION**

84.     The Badr Corps was established in 1982 as the military wing of the Supreme Council for Islamic Revolution in Iraq.

85.     From its headquarters in Iran, the Badr Corps operated extensive clandestine networks throughout Iraq in the 1990s. The group smuggled men and weapons into Iraq to conduct attacks against the Iraqi regime of Saddam Hussein.

86.     Like Hezbollah, the Badr Corps established clandestine offices in businesses and social organizations in Iraq.

87.     The Badr Corps also used Iraqi front companies to recruit operatives, collect intelligence, and circulate propaganda materials in Shi'a populated areas.

88.     Before 2003, the Badr Corps served as Iran's most important surrogate inside Iraq, acting as a de facto arm of the IRGC-QF.

89.     The Badr Corps received training and weapons from the IRGC and Hezbollah.

90.     After Saddam Hussein's overthrow in 2003, the Badr Corps renamed itself the Badr Organization, and many of its operatives joined the newly formed Iraqi security forces.

91.     Published reports indicate that thousands of members of the Badr Organization remained on the IRGC-QF payroll after 2004.

92.     Several senior Badr Organization operatives later emerged as key conduits for funneling weapons to Iranian proxies in Iraq from 2004 through 2011, including Abu Mustafa al-Sheibani, a key smuggler of deadly Iranian IEDs and EFPs, and Jamal Ja'far Muhammad, a.k.a. Abu Mahdi al-Muhandis (a.k.a. "The Engineer"), who later led Kata'ib Hezbollah (discussed further below).

93.     "Department 1000" of the IRGC-QF, known as the Ramezan Corps, is in charge of Iraqi operations and remains the largest IRGC-QF command outside of Iran. It coordinated, armed and influenced the Badr Organization.

94.     Although the Badr Organization evolved into a major political organization with seats in the new Iraqi parliament, it also played a significant role in facilitating deadly Special Groups operations in Iraq. A number of senior Special Groups commanders such as Al-Muhandis are, or were, Badr Organization personnel.

95.     After 2003, the IRGC inserted hundreds of its Iranian-trained operatives into Iraq's state security organs (notably the Iraqi Ministry of Interior's intelligence structure) in part through its influence within the Badr Organization.

2.      **JAYSH AL MAHDI ("JAM" or the "MAHDI ARMY")**

96.     Jaysh al Mahdi was established by radical Shi'a cleric Muqtada al-Sadr in June 2003. On April 18, 2004, JAM led the first major armed confrontation by Shi'a militias against U.S.-led forces in Iraq.

17

97.     JAM was co-founded by Imad Mughniyah, one of Hezbollah's most senior commanders.

98.     During the relevant period, JAM expanded its territorial control of mixed or predominantly Shi'a neighborhoods and displaced or killed the local Sunni population.

99.     JAM was able to gain initial control in many of the neighborhoods in and around Baghdad (such as the Shi'a slum locally known as "Sadr City") by offering the Shi'a population protection and social services.

100.    Al-Sadr dissolved part of his militia after 2007, but maintained a small group of Iranian-supported militants called the Promised Day Brigades ("PDB") to carry out attacks against Coalition Forces.

101.    The PDB has received funding, training and weapons from the IRGC and is one of the Special Groups.

102.    The PDB actively targeted U.S. forces in an attempt to disrupt security operations and further destabilize Iraq.

103.    For example, on June 28, 2011, the PDB issued a statement claiming responsibility for 10 mortar and Katyusha rocket attacks against U.S. military convoys in which U.S. officials confirmed that three U.S. troops were killed.

### 3.      KATA'IB HEZBOLLAH ("KH")

104.    Kata'ib Hezbollah has functioned as Iran's go-to terrorist militia in Iraq and received support from Lebanese Hezbollah, including training in weapons use, IED construction and operation, and sniper, rocket and mortar attacks.

105.    Historically, KH operated mainly in Shi'a areas of Baghdad, such as Sadr City, and throughout the south of Iraq.

106.    On June 24, 2009, the United States designated KH an FTO.

107.    The State Department's notice of KH's FTO designation stated that:

The organization has been responsible for numerous violent terrorist attacks since 2007, including improvised explosive device bombings, rocket propelled grenade attacks, and sniper operations. Kata'ib Hezbollah also targeted the International Zone in Baghdad in a November 29, 2008 rocket attack that killed two UN workers. In addition, KH has threatened the lives of Iraqi politicians and civilians that support the legitimate political process in Iraq.

108.    KH was also simultaneously designated an SDGT under E.O. 13224, because it was "responsible for numerous terrorist acts against Iraqi, U.S., and other targets in Iraq since 2007."

109.    The U.S. Treasury Department also designated KH pursuant to E.O. 13438.

110.    The Treasury Department's 2009 press release announcing KH's designation explained that KH had "committed, directed, supported, or posed a significant risk of committing acts of violence against Coalition and Iraqi Security Forces…."

111.    The Treasury press release also stated: "[f]urther, the IRGC-Qods Force provides lethal support to Kata 'ib Hizballah and other Iraqi Shia militia groups who target and kill Coalition and Iraqi Security Forces."

112.    The 2009 press release further reported that between March 2007 and June 2008, KH led a number of attacks against U.S. forces in Iraq, advising:

[a]s of 2008, Kata'ib Hizballah was funded by the IRGC-Qods Force and received weapons training and support from Lebanon-based Hizballah. In one instance, Hizballah provided training--to include building and planting IEDs and training in coordinating small and medium arms attacks, sniper attacks, mortar attacks, and rocket attacks--to Kata'ib Hizballah members in Iran.

113.    Furthermore, the 2009 U.S. Treasury Department press release noted:

Recordings made by Kata'ib Hizballah for release to the public as propaganda videos further demonstrate that Kata'ib Hizballah conducted attacks against Coalition Forces. In mid-August 2008, Coalition Forces seized four hard drives from a storage facility associated with a Kata'ib

Hizballah media facilitator. The four hard drives included approximately 1,200 videos showing Kata'ib Hizballah's sophisticated planning and attack tactics, techniques, and procedures, and Kata'ib Hizballah's use of the most lethal weapons--including RPG-29s, IRAMs, and EFPs--against Coalition Forces in Iraq.

One of the hard drives contained 35 attack videos edited with the Kata'ib Hizballah logo in the top right corner. Additionally, between February and September 2008, [Hezbollah's official television outlet] Al-Manar in Beirut, Lebanon, broadcast several videos showing Kata'ib Hizballah conducting multiple attacks against Coalition Forces in Iraq.

Immediately preceding the Government of Iraq's approval of the United States-Iraq security agreement in late November 2008, Kata'ib Hizballah posted a statement that the group would continue fighting Coalition Forces and threatened to conduct attacks against the Government of Iraq if it signed the security agreement with the United States.

114.   In 2008, the U.S. Department of Defense described the linkages it found between KH, Iran and multiple terrorist attacks against Coalition Forces in Iraq—including KH's use of EFPs:

[A]lso known as Hezbollah Brigades, is a terrorist group believed to receive funding, training, logistics and material support from Iran to attack Iraqi and coalition forces using what the military calls 'explosively formed penetrators' – roadside bombs designed to pierce armor-hulled vehicles – and other weapons such as rocket-assisted mortars.

115.   As noted above—and as stated by the U.S Treasury Department in its July 2009 press release—throughout 2008, *Al-Manar*, Hezbollah's official television outlet in Lebanon (and itself a designated SDGT since May 2006), played videos of KH launching rocket and IED attacks against U.S. troops.

116.   In this manner, Hezbollah helped publicize KH's activities and increase its profile among leading Shi'a terrorist groups.

117.   In a July 2010 press briefing, U.S. Army General Ray Odierno identified KH as the group behind increased threats to U.S. bases in Iraq.

118.    General Odierno confirmed that KH operatives had gone to Iran for special training and then returned to Iraq.

119.    General Odierno stated, "they are clearly connected to Iranian IRGC."

### 4.    ASA'IB AHL AL-HAQ ("AAH")

120.    Asa'ib Ahl Al-Haq is a Shi'a Special Group supported by Hezbollah and the IRGC-QF that conducted assassinations and operations against Iraqi civilians, Iraqi Security Forces and Coalition Forces.

121.    AAH was originally established by Senior Sadrist and MNF-I detainee Qais al-Khazali.

122.    AAH split from al-Sadr's JAM in 2006. Since that time, AAH has conducted thousands of IED attacks against U.S. and Iraqi forces, targeted kidnappings of Westerners and Iraqis, rocket and mortar attacks on the U.S. Embassy, murders of American and British soldiers, and assassination of Iraqi officials.

123.    At all relevant times, AAH received significant funding from Iran, and had links to Iran's IRGC-QF and Hezbollah.

124.    Senior Lebanese Hezbollah operative Ali Musa Daqduq ("Daqduq") provided training to AAH fighters.

125.    Daqduq reported to Youssef Hashim, the head of Lebanese Hezbollah Special Operations, and the latter reported to Abdul Reza Shahlai, the director of the IRGC-QF External Operations.

126.    AAH was one of the Iranian entities responsible for the January 20, 2007 Karbala attack on the Provincial Joint Coordination Center ("PJCC") that killed and/or injured some of the Plaintiffs (discussed below).

F. **ALL OF THE ATTACKS AT ISSUE IN THIS COMPLAINT WERE ACTS OF INTERNATIONAL TERRORISM THAT VIOLATED THE INTERNATIONAL LAW OF WAR**

127.     At no time relevant to this Action did the United States declare war or enact an Authorization for the Use of Military Force against Iran.

128.     At no time relevant to this Action did the United States engage in an armed conflict with the military forces of Iran, nor did Iran's military forces or their agents engage in lawful acts of war against Coalition Forces.

129.     At no time relevant to this action did the operatives of Hezbollah, the IRGC and the Special Groups who killed and injured Coalition Forces and civilians in Iraq carry fixed distinctive signs recognizable at a distance, carry arms openly, conduct their operations in accordance with the laws and customs of war, or enjoy any form of combatant immunity for their acts.

130.     The specific attacks alleged herein were all carried out by terrorists and terrorist organizations like Hezbollah and the Special Groups, with the material support of Iran and Defendants, not by armed forces of recognized governments or military forces.

131.     The deaths and injuries Plaintiffs sustained were not the result of, nor did they occur in the course of, a declared war with Iran, or an armed conflict between the United States and Iran.

132.     The conduct of Iran, the IRGC, Hezbollah and the Special Groups violated the laws of armed conflict (including, *e.g.*, AAH operatives masquerading as members of U.S. armed forces and executing defenseless prisoners), and the attacks upon Iraqi and other civilians constituted a substantial, rather than an incidental, part of their objectives and conduct.

133.     The acts of the IRGC, Hezbollah, and/or the Special Groups that injured the Plaintiffs were acts of hostage taking and extrajudicial killing as defined by 28 U.S.C. §§ 1605A(h)(2) and 1605A(h)(7), and acts of international terrorism as defined by of 18 U.S.C. § 2331.

134.    The aforesaid acts of hostage taking, extrajudicial killing and international terrorism were enabled by Defendants' provision of material support and resources as defined by 28 U.S.C. § 1605A(h)(3) and 18 U.S.C. § 2339A.

**THE PLAINTIFFS**

**1.    THE MAY 14, 2007 ATTACK – BAGHDAD**

**The Brooks Family**

135.    Plaintiff Joshua Brooks is a citizen of the United States and domiciled in the State of Tennessee.

136.    On May 14, 2007, Joshua Brooks, then 21, was serving in the U.S. military in Iraq when an EFP hit the Humvee in which he was traveling in Baghdad.

137.    The blast shattered Mr. Brooks' left fibula.

138.    Mr. Brooks also suffered tissue loss in his left leg, nerve and tendon damage in his left foot and ankle, and scarring on his left foot.

139.    Mr. Brooks has undergone over twenty surgeries to treat his injuries.  His injuries have also necessitated extensive physical therapy.

140.    Mr. Brooks was diagnosed with post-traumatic stress disorder ("PTSD").  He has been prescribed medication and has sought counseling to treat the emotional impact of the attack.

141.    As a result of the attack, and the injuries he suffered, Joshua Brooks has experienced severe physical and mental anguish and extreme emotional pain and suffering.

142.    Plaintiff Joyce Brooks is a citizen of the United States and domiciled in the State of Kentucky.  She is the mother of Joshua Brooks.

143.    Plaintiff Danny Brooks is a citizen of the United States and domiciled in the State of Kentucky.  He is the father of Joshua Brooks.

144.    Plaintiff Daniel Tyler Brooks is a citizen of the United States and domiciled in the State of Kentucky. He is the brother of Joshua Brooks.

145.    As a result of the attack, and the injuries Joshua Brooks has suffered, Plaintiffs Joyce Brooks, Danny Brooks and Daniel Tyler Brooks have experienced severe mental anguish and extreme emotional pain and suffering.

## 2.    THE APRIL 29, 2007 ATTACK – BAGHDAD

### The Martin Family

146.    Jay E. Martin was a citizen of the United States and domiciled in the State of Maryland when he was killed in Iraq.

147.    On April 29, 2007, Jay E. Martin, aged 29, was serving in the U.S. military in Iraq when an EFP detonated near his unit.

148.    Jay E. Martin was killed in the attack.

149.    The weapon used to kill Jay E. Martin was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

150.    Plaintiff Lark Adams is a citizen of the United States and domiciled in the State of Maryland. She is the sister of Jay E. Martin.

151.    As a result of the attack, and the death of Jay E. Martin, Plaintiff Lark Adams has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her brother's society, companionship, comfort, advice and counsel.

## 3.    THE MAY 18, 2007 ATTACK – BAGHDAD

### The Brown Family

152.    Scott J. Brown was a citizen of the United States and domiciled in the State of Colorado when he was killed in Iraq.

24

153.     On May 18, 2007, Scott J. Brown, aged 33, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

154.     Scott J. Brown was killed in the attack.

155.     The weapon used to kill Scott J. Brown was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

156.     Plaintiff Delilah Brown is a citizen of the United States and domiciled in the State of Tennessee. She is the widow of Scott J. Brown.

157.     As a result of the attack, and the death of Scott J. Brown, Plaintiff Delilah Brown has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice and counsel.

## 4.     THE JUNE 17, 2007 ATTACK – BAGHDAD

**The Tracy Family**

158.     Jacob Tracy was a citizen of the United States and domiciled in the State of Illinois when he was killed in Iraq.

159.     On June 17, 2007, Jacob Tracy, aged 20, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

160.     Jacob Tracy was killed as a result of injuries sustained in the attack.

161.     The weapon used to kill Jacob Tracy was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

162.     Plaintiff Sheila Tracy is a citizen of the United States and domiciled in the State of Illinois. She is the mother of Jacob Tracy.

163.     Plaintiff Sheila Tracy brings an action individually and on behalf of the Estate of Jacob Tracy, as its legal representative.

164.     Plaintiff Donald Tracy is a citizen of the United States and domiciled in the State of Illinois. He is the father of Jacob Tracy.

165.     Plaintiff Nichole Sweeney is a citizen of the United States and domiciled in the State of Illinois. She is the sister of Jacob Tracy.

166.     Plaintiff Christina Sheridan is a citizen of the United States and domiciled in the State of Illinois. She is the sister of Jacob Tracy.

167.     As a result of the attack, and the death of Jacob Tracy, Plaintiffs Sheila Tracy, Donald Tracy, Nichole Sweeney, and Christina Sheridan have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Benson Family**

168.     Plaintiff Matthew Benson is a citizen of the United States and domiciled in the State of Kansas.

169.     On June 17, 2007, Matthew Benson, then 28, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

170.     Matthew Benson was injured in the attack.

171.     The weapon used to injure Mr. Benson was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

172.     As a result of the attack, he sustained skull fracture.  Copper shavings were imbedded in his body.

173.     He also sustained burns and bruising on his back as well as lacerations to his hands, face, and head.  He has experienced severe headaches.

174.     He has been diagnosed with PTSD.

175.     As a result of the attack, and the injuries he suffered, Plaintiff Matthew Benson has experienced severe mental anguish and extreme emotional pain and suffering.

176.     Plaintiff Melissa Benson is a citizen of the United States and domiciled in the State of Kansas.  She is the wife of Matthew Benson.

177.     Plaintiff C.B., a minor represented by his legal guardian, Matthew Benson, is a citizen of the United States and domiciled in the State of Kansas. He is the son of Matthew Benson.

178.     Plaintiff B.B., a minor represented by his legal guardian, Matthew Benson, is a citizen of the United States and domiciled in the State of Kansas. He is the son of Matthew Benson.

179.     Plaintiff Daniel P. Benson is a citizen of the United States and domiciled in the State of Kansas.  He is the father of Matthew Benson.

180.     Plaintiff Carol Benson is a citizen of the United States and domiciled in the State of Kansas.  She is the mother of Matthew Benson.

181.     Plaintiff Daniel R. Benson is a citizen of the United States and domiciled in the State of Kansas.  He is the brother of Matthew Benson.

182.     As a result of the attack, and the injuries Matthew Benson has suffered, Plaintiffs Melissa Benson, C.B., B.B., Daniel P. Benson, Carol Benson and Daniel R. Benson have experienced severe mental anguish, and extreme emotional pain and suffering.

## 5.     THE JUNE 25, 2007 ATTACK – BAGHDAD

### The Edwards Family

183.     Plaintiff Drew Edwards is a citizen of the United States and domiciled in the State of Missouri.

184.     On June 25, 2007, Drew Edwards, then 22, was serving in the U.S. military in Iraq when an EFP hit the Humvee in which he was traveling in Baghdad.

185.     As a result of the attack, Drew Edwards suffered an injury to his neck.

186. He has been diagnosed with a traumatic brain injury ("TBI").

187. Drew Edwards was also diagnosed with PTSD. He has been prescribed medication to address the emotional impact of the attack.

188. As a result of the attack, and the injuries he suffered, Drew Edwards has experienced physical pain, severe mental anguish and extreme emotional pain and suffering.

189. Plaintiff Donielle Edwards is a citizen of the United States and domiciled in the State of Missouri. She is the wife of Drew Edwards.

190. As a result of the attack, and the injuries Drew Edwards has suffered, Plaintiff Donielle Edwards has experienced severe mental anguish and extreme emotional pain and suffering.

6. **THE JULY 24, 2007 ATTACK – UMM QASR**

**Sean Harrington**

191. Plaintiff Sean Harrington is a citizen of the United States and domiciled in the State of Pennsylvania.

192. On July 24, 2007, Sean Harrington, then 22, was serving in the U.S. military in Iraq when an EFP struck the Humvee in which he was traveling outside of Umm Qasr.

193. Shrapnel from the EFP hit Sean Harrington's head and face. Copper from the explosive remains fused to his face.

194. The impacting shrapnel has resulted in a loss of partial sight in his right eye and most of his hearing in his right ear.

195. Mr. Harrington has been diagnosed with a TBI. Medication has been prescribed to address this condition. He continues to endure migraines as a result of the attack.

196. Sean Harrington was also diagnosed with PTSD a result of the attack, for which he has received treatment.

197.    As a result of the attack, and the injuries he suffered, Sean Harrington has experienced severe physical and mental anguish and extreme emotional pain and suffering.

## 7.    THE JULY 31, 2007 ATTACK – BAGHDAD

### The Jairala Family

198.    Alfred H. Jairala was a citizen of the United States and domiciled in the State of Florida when he was killed in Iraq.

199.    On July 31, 2007, Alfred H. Jairala, aged 28, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

200.    Alfred H. Jairala was killed in the attack.

201.    The weapon used to kill Alfred H. Jairala was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

202.    Plaintiff Margarita Aristizabal is a citizen of the United States and domiciled in the State of Florida. She is the widow of Alfred H. Jairala.

203.    Plaintiff Margarita Aristizabal brings an action individually and on behalf of the Estate of Alfred H. Jairala, as its legal representative.

204.    Plaintiff J.J., a minor represented by her legal guardian, Margarita Aristizabal, is a citizen of the United States and domiciled in the State of Florida. She is the daughter of Alfred H. Jairala.

205.    Plaintiff Sebastian Niuman is a citizen of the United States and domiciled in the State of Florida.  He is the step-son of Alfred H. Jairala.

206.    As a result of the attack, and the death of Alfred H. Jairala, Plaintiffs Margarita Aristizabal and Sebastian Jairala have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

**8.**      **THE OCTOBER 29, 2007 ATTACK – UMM QASR**

**Tyler Ginavan**

207.      Plaintiff Tyler Ginavan is a citizen of the United States and domiciled in the State of Kansas.

208.      On October 29, 2007, Tyler Ginavan, then 26, was serving in the U.S. military in Iraq when an EFP struck the Humvee in which he was traveling in Umm Qasr.

209.      As a result of the attack, copper from the EFP hit Tyler Ginavan's face, neck, knee, and calf.  This has necessitated its surgical removal.   Copper from the EFP remains fused to Mr. Ginavan's jawline.

210.      Tyler Ginavan has been diagnosed with PTSD, and he has received treatment and counseling.  He has been prescribed medication to address both the physical pain and emotional impact of the attack.

211.      As a result of the attack, and the injuries he suffered, Tyler Ginavan has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**9.**      **THE FEBRUARY 20, 2008 ATTACK – BAGHDAD**

**The Alvarez Family**

212.      Conrad Alvarez was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

213.      On February 20, 2008, Conrad Alvarez, aged 22, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

214.      Conrad Alvarez was killed in the attack.

215.      The weapon used to kill Conrad Alvarez was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

216.    Plaintiff Belinda Garcia is a citizen of the United States and domiciled in the State of Texas. She is the mother of Conrad Alvarez.

217.    As a result of the attack, and the death of Conrad Alvarez, Plaintiff Belinda Garcia has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

## 10.    THE MAY 17, 2009 ATTACK – BAGHDAD

### The Canine Family

218.    Robert Canine is a citizen of the United States and domiciled in the State of Missouri.

219.    On May 17, 2009, Robert Canine, age 29, was serving in the U.S. military in Iraq.

220.    Mr. Canine was on a routine patrol in northwest Baghdad when his vehicle was struck by an EFP.

221.    The weapon used to injure Mr. Canine was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

222.    As a result of the attack, he sustained significant injuries due to the impact of shrapnel and portions of the explosive device impacting his body.

223.    Mr. Canine's injuries included significant damage to his right leg and foot and the essential removal of the toes of his left foot as well as the loss of a great deal of blood.

224.    The injuries necessitated the amputation of his right leg and left foot.

225.    Apart from the injuries to his legs and feet, he also sustained a large laceration that ran from his buttocks to the back of his knee. It was determined that muscle and tissue was removed in these areas due to the blast.

226.    Mr. Canine has suffered infections that have required treatment and assessment.

227.    Apart from medical treatment while in Iraq, Mr. Canine received treatment and rehabilitation at Walter Reed Hospital for approximately 18 months.

228.    Mr. Canine has been diagnosed with PTSD and has received treatment and counseling. He has been prescribed medication to address both the pain and emotional impact of the attack.

229.    Mr. Canine continues to experience pain and emotional distress each day, and he receives treatment for his injuries.

230.    Plaintiff Jennifer Roose is a citizen of the United States and domiciled in the State of Ohio. She is the sister of Robert Canine.

231.    As a result of the attack, and the injuries Robert Canine suffered, Plaintiff Jennifer Roose has experienced severe mental anguish and extreme emotional pain and suffering.

**Nathan Richards**

232.    Plaintiff Nathan Richards is a citizen of the United States and domiciled in the State of Florida.

233.    On May 17, 2009, Nathan Richards, then 22, was serving in the U.S. military in Iraq.

234.    Mr. Richards was on a routine patrol in northwest Baghdad when his vehicle was struck by an EFP.

235.    The weapon used to injure Mr. Richards was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

236.    As a result of the attack, he sustained a concussion and was knocked unconscious.  His eardrum was also ruptured as a result of the blast.

237.    Mr. Richards has developed vertigo and has experienced migraines.

238.     He has been diagnosed with a TBI and has dealt with long-term and short-term memory loss.

239.     He has been diagnosed with PTSD and has had nightmares and flashbacks as well as experienced survivor's guilt.  He has received treatment and counseling for these issues.

240.     As a result of the attack, and the injuries he suffered, Plaintiff Nathan Richards has experienced severe mental anguish and extreme emotional pain and suffering.

**Roady Landtiser**

241.     Plaintiff Roady Landtiser is a citizen of the United States and domiciled in the State of Oklahoma.

242.     On May 17, 2009, Roady Landtiser, then 21, was serving in the U.S. military in Iraq.

243.     Mr. Landtiser was on a routine patrol in northwest Baghdad when his vehicle was struck by an EFP.

244.     The weapon used to injure Mr. Landtiser was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

245.     As a result of the attack, he sustained a concussion and was rendered unconscious.

246.     He developed tinnitus in his right ear and this condition continues to the present day.

247.     Mr. Landtiser has experienced flashbacks and night terrors.

248.     He has been diagnosed with PTSD.  He has received treatment, has been prescribed medication, and sought counseling for these issues.

249.     As a result of the attack, and the injuries he suffered, Plaintiff Roady Landtiser has experienced severe mental anguish and extreme emotional pain and suffering.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**AGAINST DEFENDANTS ON BEHALF OF EACH PLAINTIFF IDENTIFIED HEREIN WHO SURVIVED AN ACT OF INTERNATIONAL TERRORISM FOR DEFENDANTS' MATERIAL SUPPORT TO ACTS OF EXTRAJUDICIAL KILLING THAT RESULTED IN PERSONAL INJURY PURSUANT TO 28 U.S.C. § 1605A(c)**

250.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

251.    Plaintiffs identified in the foregoing paragraphs were grievously injured by Defendants' provision of material support (within the meaning of § 1605A(h)(3)) to Hezbollah and the IRGC which planned, conspired and provided substantial support to extrajudicial killings and attempted extrajudicial killings that injured the Plaintiffs.

252.    As a direct and proximate result of the willful, wrongful, and intentional acts of the Defendants and their agents, Plaintiffs identified in the foregoing paragraphs were injured and endured severe physical injuries, extreme mental anguish, pain and suffering, and economic losses.

253.    Plaintiffs' compensatory damages, include, but are not limited to, their severe physical injuries, extreme mental anguish, pain and suffering, and any economic losses determined by the trier of fact.

254.    Defendants' conduct was criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages against Defendants pursuant to 28 U.S.C. § 1605A(c)(4).

## SECOND CLAIM FOR RELIEF
### AGAINST DEFENDANTS ON BEHALF OF THE ESTATES OF PLAINTIFFS IDENTIFIED HEREIN FOR DEFENDANTS' MATERIAL SUPPORT TO ACTS OF EXTRAJUDICIAL KILLING THAT RESULTED IN WRONGFUL DEATH PURSUANT TO 28 U.S.C. § 1605A(c)

255.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

256.   The Estates of Plaintiffs listed in the foregoing paragraphs assert claims on behalf of the decedents who were grievously injured by Defendants' provision of material support (within the meaning of § 1605A(h)(3)), to Hezbollah and the IRGC which planned, conspired and provided substantial support to acts of extrajudicial killing that caused the decedents' deaths.

257.   As a direct and proximate result of Defendants' willful, wrongful, and intentional acts and the willful, wrongful, and intentional acts of their agents, the decedents listed in the foregoing paragraphs endured physical injury, extreme mental anguish, and pain and suffering that ultimately led to their deaths.

258.   Defendants are therefore liable for the full amount of Plaintiffs' compensatory damages, including physical injuries, extreme mental anguish, pain and suffering, wrongful death, survivorship, and any pecuniary loss (or loss of income to the estates).

259.   Defendants' conduct was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages against Defendant pursuant to 28 U.S.C. § 1605A(c)(4).

## THIRD CLAIM FOR RELIEF
### AGAINST DEFENDANTS ON BEHALF OF THE FAMILIES OF PLAINTIFFS IDENTIFIED HEREIN AS INJURED OR KILLED AS A RESULT OF DEFENDANTS' MATERIAL SUPPORT TO ACTS OF EXTRAJUDICIAL KILLING FOR SOLATIUM AND INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS PURSUANT TO 28 U.S.C. § 1605A(c)

260.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

261.    Defendants' acts in providing material support for acts of extrajudicial killing were intended to inflict severe emotional distress on the Plaintiffs.

262.    As a result of Defendants' acts, the families of individuals identified in the foregoing paragraphs as injured or killed as a result of Defendants' acts in providing material support for acts of extrajudicial killing have suffered severe emotional distress, extreme mental anguish, loss of sleep, loss of appetite, and other severe physical manifestations, as well as other harms to be set forth to the trier of fact.

263.    Defendants' conduct was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages against Defendant pursuant to 28 U.S.C. § 1605A(c).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand:

(a)    Judgment for all Plaintiffs against Defendants, jointly and severally, for compensatory damages, including, but not limited to, physical injury, extreme mental anguish, pain and suffering, economic losses and solatium, in amounts to be determined at trial;

(b)    Judgment for Plaintiff Estates against Defendants, jointly and severally, for compensatory damages for wrongful death, including, but not limited to, physical injury, extreme mental anguish, pain and suffering, economic losses, wrongful death, survivorship and any pecuniary loss (or loss of income to the estates) in amounts to be determined at trial;

(c)     Judgment for all Plaintiffs against Defendants, jointly and severally, for punitive damages in an amount to be determined at trial;

(d)     Plaintiffs' costs and expenses;

(e)     Plaintiffs' attorneys' fees; and

(f)     Such other and further relief as the Court finds just and equitable.

Dated: April 20, 2017

**OSEN LLC**

By      /s/ Naomi B. Weinberg
        Naomi B. Weinberg (DC Bar No. NJ006)
        Gary M. Osen (DC Bar No. NJ009)
        Ari Ungar (DC Bar No. NJ008)
        Aaron Schlanger (DC Bar No. NJ007)
        William A. Friedman (DC Bar No. NJ012)
        Dina Gielchinsky (DC Bar No. NJ013)
        Michael Radine (DC Bar No. NJ015)
        Peter Raven-Hansen, Of Counsel
        (DC Bar No. 215897)
        2 University Plaza Drive, Suite 402
        Hackensack, New Jersey
        (201) 265-6400

        **TURNER & ASSOCIATES, P.A.**
        C. Tab Turner
        4705 Somers Avenue, Suite 100
        North Little Rock, AR 72116
        (501) 791-2277

        Attorneys for Plaintiffs